UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

          Defendants.

_____/

          **INDICTMENT**

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.      Medicare is a federally-funded program administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Medicare provides health insurance for, among others, persons aged 65 and older, certain younger people with disabilities, and people with end-stage renal disease. Individuals who receive benefits under Medicare are referred to as Medicare beneficiaries. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

2.      The Medicare Program includes coverage under two primary components, hospital insurance (Part A) and medical insurance (Part B). Part A of the Medicare Program

covers, among other services, certain eligible home health care costs for medical services provided to beneficiaries because of an illness or disability that causes them to be homebound. Part B of the Medicare Program covers the costs of physicians' services and other ancillary services not covered by Part A.  Wisconsin Physicians Service ("WPS") is a company that contracts with CMS to process and pay Part A and Part B claims.

3.      Payments under the Medicare Program are often made directly to the provider of the goods or services, rather than to the beneficiary.  This direct payment occurs when the provider submits claims to Medicare for payment, either directly or through a billing company.

4.      Physicians, clinics, and other health care providers are able to apply for and obtain a Medicare "provider number."  A health care provider who is issued a Medicare provider number is able to file claims with Medicare to obtain reimbursement for services provided to Medicare beneficiaries.  A valid Medicare claim must set forth, among other things, the beneficiary's name, the date the service was provided, the cost of the service, and the name and identification number of the physician or health care provider who ordered the service.

5.      Medicaid is a federally-assisted grant program for the states.  CMS administers the federal assistance to Medicaid.  At the state level in Michigan, the Department of Community Health, Medical Services Administration, an agency of the State of Michigan, administers Medicaid.  Medicaid provides health insurance to Michigan residents who are indigent or otherwise do not have traditional insurance coverage.  Physicians, clinics, and other health care providers are able to apply for and obtain a Medicaid "provider number."  A health care provider who is issued a Medicaid provider number is able to file claims with Medicaid to obtain reimbursement for services provided to Medicaid beneficiaries.  A valid Medicaid claim must set forth, among other things, the beneficiary's name, the date the service was provided, the cost of

the service, and the name and identification number of the physician or health care provider who ordered the service. Medicaid is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

6.     Blue Cross Blue Shield of Michigan ("BCBSM") is a health care benefit program, as defined in Title 18, U.S.C., Section 24(b), in that it is a private insurance program, affecting commerce, which provides coverage for eligible costs for services provided to its subscribers throughout the United States.

7.     As a condition of payment, Medicare, Michigan Medicaid, and BCBSM require that the services submitted for payment are medically indicated and necessary for the health of the patient.

8.     SHANNON WIGGINS, D.O., ("WIGGINS") is a physician licensed to practice medicine in the State of Michigan. WIGGINS's practice, East Michigan Family Care ("EMFC"), occupied two office buildings located at 2310 E. Michigan Avenue and 4415 Grand River, in Lansing, Michigan.

9.     MOHAMAD ABDULJABER ("ABDULJABER") is married to WIGGINS and acts as the office manager of EMFC.

## COUNT 1
### (Conspiracy to Commit Health Care Fraud)

Paragraphs 1 through  9 of the General Allegations section of this Indictment are

realleged and incorporated by reference as if fully set forth herein.

10.     Beginning by no later than in or about January 2007 and continuing through at

least April 2011, in the Southern Division of the Western District of Michigan, and elsewhere,

the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

combined, conspired, confederated and agreed with each other and with other persons, both

known and unknown to the grand jury, to knowingly and willfully execute a scheme and artifice

to defraud and to obtain money from Medicare, Medicaid and BCBSM by means of false and

fraudulent pretenses and representations in connection with claims submitted to Medicare,

Medicaid and BCBSM for diagnostic testing services that were neither medically indicated nor

necessary for the health of the patient, in violation of Title 18, United States Code, Sections 1347

and 1349.

### Purpose of the Conspiracy

11.     The purpose of the conspiracy was to obtain payments from Medicare, Medicaid

and BCBSM for the purported performance of electrodiagnostic testing services that were neither

medically indicated nor necessary for the health of the patient receiving such testing.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to

accomplish the purpose of the conspiracy included, among others, the following:

12.     Throughout the time period of the conspiracy, ABDULJABER solicited his tenants and other associates to seek medical treatment and obtain controlled substances from EMFC.

13.     WIGGINS treated patients at her EMFC offices.   WIGGINS and ABDULJABER arranged for a physical therapist to regularly perform electrodiagnostic testing for the EMFC patients at the EMFC offices.

14.     When the physical therapist came to the EMFC offices, WIGGINS routinely referred her patients to the physical therapist for electrodiagnostic testing regardless of whether the electrodiagnostic testing was medically indicated and necessary for the health of the patient. WIGGINS did not typically schedule her patients for electrodiagnostic testing in advance; rather, WIGGINS typically referred the patients for electrodiagnostic testing based simply upon the fact that the physical therapist happened to be at the EMFC offices.

15.     WIGGINS and ABDULJABER regularly encouraged the other medical practitioners at EMFC to refer patients for electrodiagnostic testing on the days when the physical therapist happened to be at the EMFC offices, regardless of whether the electrodiagnostic testing was medically indicated and necessary for the health of the patient.

16.     Throughout the time period of the conspiracy, WIGGINS presigned blank medical order forms for electrodiagnostic testing and provided those forms to the physical therapist.

17.     Throughout the time period of the conspiracy, WIGGINS presigned blank prescription forms for electrodiagnostic testing and provided those forms to the physical therapist.

18.     Throughout the time period of the conspiracy, the physical therapist prepared and maintained pre-authorization forms with the diagnosis codes and medical diagnosis comments section of the authorization completed even though the patient and his/her condition were unknown.

19.     The physical therapist saw the patients who WIGGINS and the other EMFC medical practitioners referred, purportedly performed the electrodiagnostic testing, and submitted claims for the purported electrodiagnostic testing, either directly or through another medical practitioner.

20.     The physical therapist prepared reports of the purported electrodiagnostic testing and provided those reports to EMFC to put in the patient files; however, while those reports contained identifying information for individual patients, the reports reflected the fact that, in many cases, no individualized testing or diagnosis was actually performed.

21.     The physical therapist shared the proceeds of the claims for the electrodiagnostic testing with WIGGINS and ABDULJABER through referral payments and inflated, non-market rent payments.

<u>Overt Acts</u>

In furtherance of the conspiracy, and to accomplish its purpose, at least one of the conspirators committed and caused to be committed, in the Western District of Michigan, one or more of the following overt acts:

22.     On or about August 16, 2010, WIGGINS referred patient B.N. for electrodiagnostic testing that was not medically indicated or necessary for the health of the patient.

23.     On or about September 30, 2010, WIGGINS referred patient J.D. for electrodiagnostic testing that was not medically indicated or necessary for the health of the patient.

24.     On or about April 12, 2011, WIGGINS referred patient J.L. for electrodiagnostic testing that was not medically indicated or necessary for the health of the patient.

25.     On or about June 1, 2007, the physical therapist issued a check for $200.00 to WIGGINS.

26.     On or about November 8, 2007, the physical therapist issued a check for $1,000.00 to WIGGINS.

27.     On or about October 12, 2007, the physical therapist issued a check for $2,000.00 to WIGGINS.

28.     On or about January 1, 2008, WIGGINS entered into an agreement calling for rental payments of $1,500.00 per month which, in truth and fact, were payments for referring patients for electrodiagnostic tests which she knew were not medically indicated and necessary for the health of the patients.

18 U.S.C. § 1347
18 U.S.C. § 1349

## COUNT 2
### (Conspiracy to Pay and Receive Health Care Kickbacks)

29.     Paragraphs 1 through 9 are incorporated as if fully set forth herein.

30.     Beginning by January 2004 and continuing to at least April 2011 in the Southern Division of the Western District of Michigan, and elsewhere, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

did knowingly and willfully combine, conspire, confederate and agree with each other and with others known and unknown to the grand jury, to commit certain offenses against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b), by:

31.     knowingly and willfully paying and offering remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring beneficiaries for the furnishing and arranging for the furnishing for any item and service for which payment may be made in whole or in part by a Federal health care program; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program.

32.     knowingly and willfully soliciting and receiving remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring beneficiaries for the furnishing and arranging for the furnishing for any item and service for which payment may be made in whole or in part by a Federal health care program; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program.

<u>Purpose of the Conspiracy</u>

33.     It was the purpose of the conspiracy that WIGGINS, ABDULJABER and their co-conspirators would unlawfully enrich themselves by paying and receiving kickbacks for the referral of Medicare and Medicaid beneficiaries for electrodiagnostic testing services that were submitted to Medicare and Medicaid for payment.

<u>Manner and Means of the Conspiracy</u>

The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among others, the following:

34.     WIGGINS and ABDULJABER negotiated agreements with a physical therapist to refer patients for electrodiagnostic testing by the physical therapist in return for receipt of payments for the patient referrals.   The physical therapist saw patients for purported electrodiagnostic testing at the offices of EMFC and later submitted claims to Medicare and Medicaid, or cause such claims to be submitted, for the purported electrodiagnostic testing.

35.     Whenever the physical therapist came to EMFC, WIGGINS referred patients for electrodiagnostic testing in return for receipt of payment for the patient referrals.  WIGGINS and ABDULJABER also encouraged and pressured other practitioners who worked at EMFC to refer patients for electrodiagnostic testing to the physical therapist whenever the physical therapist was at EMFC.

<u>Overt Acts</u>

In furtherance of the conspiracy, and to accomplish its purpose, at least one of the conspirators committed and caused to be committed, in the Western District of Michigan, one or more of the following overt acts:

36.     On or about January 22, 2004, WIGGINS entered into an agreement with a physical therapist to refer patients for electrodiagnostic testing in return for payment of $100.00 per patient referral.

37.     On or about August 25, 2005, the physical therapist issued a check for $500.00 to WIGGINS for referring patients for electrodiagnostic tests.

38.     On or about August 25, 2005, the physical therapist issued a check for $300.00 to WIGGINS for referring patients for electrodiagnostic tests.

39.     On or about June 1, 2007, the physical therapist issued a check for $200.00 to WIGGINS for referring patients for electrodiagnostic tests.

40.     On or about October 12, 2007, the physical therapist issued a check for $2,000.00 to WIGGINS for referring patients for electrodiagnostic tests.

41.     On or about November 8, 2007, the physical therapist issued a check for $1,000.00 to WIGGINS for referring patients for electrodiagnostic tests.

42.     On or about January 1, 2008, WIGGINS entered into an agreement with the physical therapist for the physical therapist to pay $1,500.00 per month for rent, which payments were, in truth and fact, for referring patients to the physical therapist for electrodiagnostic tests.

43.     On or about March 31, 2009, the physical therapist issued a check for $1,000.00 to WIGGINS for referring patients for electrodiagnostic tests.

44.     On or about January 26, 2010, the physical therapist issued a check for $1,000.00 to WIGGINS for referring patients for electrodiagnostic tests.

45.     Throughout the time of the conspiracy, WIGGINS and ABDULJABER encouraged employees at EMFC to refer patients for electrodiagnostic testing knowing that the referrals would result in illegal kickback payments.

46.     Throughout the time of the conspiracy, WIGGINS referred patients for

electrodiagnostic testing knowing that such referrals would result in illegal kickback payments.

18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)

## COUNT 3
### (Conspiracy to Distribute Controlled Substances
### Outside the Usual Course of Professional Practice)

47.     Beginning by January 2008 and continuing through at least January 2011, in the

Southern Division of the Western District of Michigan, and elsewhere, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

did knowingly and willfully combine, conspire, confederate and agree with each other and with

other persons known and unknown to the grand jury to distribute methadone and oxycodone,

Schedule II controlled substances, and hydrocodone, a Schedule III controlled substance, outside

the usual course of professional practice and for no legitimate medical purpose in violation of

Title 21, United States Code, Section 841.

### Purpose of the Conspiracy

48.     It was the purpose of the conspiracy for WIGGINS and ABDULJABER to

unlawfully enrich themselves by providing controlled substance prescriptions outside the usual

course of professional practice and for no legitimate medical purpose.

### Manner and Means of the Conspiracy

The manner and means by which WIGGINS and ABDULJABER and their co-

conspirators sought to accomplish the purpose of the conspiracy included, among others, the

following:

49.     ABDULJABER solicited patients to EMFC with the intention of providing the

patients with prescriptions for controlled substances for which the patients would return on a

monthly basis and be billed for an office visit, even though the prescriptions for controlled

substances were outside the usual course of professional practice and for no legitimate medical purpose.

50.     When other practitioners at EMFC discharged patients from the practice who should not have been receiving controlled substances, ABDULJABER would authorize those patients to be accepted back into the practice and refer those patients to WIGGINS so that the patients could continue to receive controlled substances.

51.     WIGGINS continued to prescribe controlled substances to patients who had been discharged from EMFC by other practitioners for abusing controlled substances, for selling their controlled substances, and for obtaining controlled substances from other professionals in addition to EMFC.

52.     ABDULJABER removed the drug testing kits from EMFC so that the practitioners could not drug test the patients who were receiving controlled substances to determine whether such patients were either using the controlled substances prescribed or abusing other controlled substances.


21 U.S.C. § 846
21 U.S.C. § 841(a)
21 U.S.C. § 841(b)(1)(C) & (b)(1)(E)

## COUNTS 4-12
### (Distribution of Oxycodone and Methadone Outside the
### Usual Course of Professional Practice)

On or about the dates set forth below, in Ingham County, in the Southern Division of the

Western District of Michigan, the defendant,

SHANNON WIGGINS, D.O.,

knowingly and intentionally distributed a mixture or substance containing a detectable amount of

oxycodone, a Schedule II controlled substance, and methadone, a Schedule II controlled substance,

as listed below, outside the usual course of professional practice and for no legitimate medical

purpose, each instance of which constitutes a separate count of this Indictment:

| Count | Approximate Date of Distribution | Patient | Controlled Substance | Amount |
|-------|----------------------------------|---------|----------------------|--------|
| 4 | September 16, 2008 | B.J. | Oxycodone, a/k/a "OxyContin" | 900 80mg pills |
| 5 | September 16, 2008 | B.J. | Oxycodone, a/k/a "OxyContin" | 900 40mg pills |
| 6 | September 16, 2008 | B.J. | Methadone | 1800 10mg  pills |
| 7 | November 20, 2008 | B.J. | Oxycodone, a/k/a "OxyContin" | 900 80mg pills |
| 8 | November 20, 2008 | B.J. | Oxycodone, a/k/a "OxyContin" | 900 40mg pills |
| 9 | November 20, 2008 | B.J. | Methadone | 1800 10mg  pills |
| 10 | January 23, 2009 | B.J. | Oxycodone, a/k/a "OxyContin" | 1350 80mg pills |
| 11 | January 23, 2009 | B.J. | Oxycodone, a/k/a "OxyContin" | 1350 40mg pills |
| 12 | January 23, 2009 | B.J. | Methadone | 2700 10mg pills |

21 U.S.C. § 841(a)(1)
21 U.S.C. § 841(b)(1)(C)

## COUNT 13
### (Filing a False Tax Return)

53.     On or about March 1, 2012, in the Southern Division of the Western District of

Michigan and elsewhere, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

a married couple and residents of Okemos, Michigan, did willfully make and subscribe a United

States Individual Income Tax Return, Form 1040, for 2009, which was verified by a written

declaration that it was made under the penalties of perjury and which SHANNON WIGGINS,

D.O., and MOHAMAD ABDULJABER did not believe to be true and correct as to every

material matter.  The United States Individual Income Tax Return, Form 1040, for 2009, which

was filed with the Director, Internal Revenue Service Center, at Fresno, California, reported in

the Attached Schedule C for East Michigan Family Care gross receipts of $910,282.00, which

included $52,000.00 of cash receipts, whereas, SHANNON WIGGINS, D.O., and MOHAMAD

ABDULJABER, then and there knew that East Michigan Family Care had gross receipts

substantially exceeding this amount.

26 U.S.C. §7206(1)

## COUNT 14
**(Failing to File a Tax Return)**

54.     During the calendar year 2010, in the Southern Division of the Western District of Michigan, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

a married couple and residents of Okemos, Michigan, received gross income in excess of $18,700.00.  By reason of that gross income, SHANNON WIGGINS, D.O., and MOHAMAD ABDULJABER, were required by law, following the close of calendar year 2010 and on or before April 18, 2011, to make an income tax return to the Internal Revenue Service Center at Fresno, California or Cincinnati, Ohio, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of their gross income and any deductions and credits to which they were entitled.  Well knowing and believing all the foregoing, SHANNON WIGGINS, D.O., and MOHAMAD ABDULJABER did willfully fail, on or about April 18, 2011, in the Western District of Michigan and elsewhere, to make an income tax return.

26 U.S.C. § 7203

## <u>COUNT 15</u>
### (Failing to File a Tax Return)

55.     During the calendar year 2011, in the Southern Division of the Western District of

Michigan, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

a married couple and residents of Okemos, Michigan, had received gross income in excess of

$19,000.00.  By reason of that gross income, SHANNON WIGGINS, D.O., and MOHAMAD

ABDULJABER, were required by law, following the close of calendar year 2011 and on or

before April 17, 2012, to make an income tax return to the Internal Revenue Service Center at

Fresno, California or Cincinnati, Ohio, or to another Internal Revenue Service office permitted

by the Commissioner of Internal Revenue, stating specifically the items of their gross income

and any deductions and credits to which they were entitled.  Well knowing and believing all the

foregoing, SHANNON WIGGINS, D.O., and MOHAMAD ABDULJABER, did willfully fail,

on or about April 17, 2012, in the Western District of Michigan and elsewhere, to make an

income tax return.


26 U.S.C. § 7203

## COUNT 16
### (Food Stamp Fraud)

56.     On or about May 20, 2011, in Ingham County, in the Southern Division of the

Western District of Michigan, the defendant,

MOHAMAD ABDULJABER,

knowingly and unlawfully used, and aided and abetted in using, a Supplemental Nutritional

Assistance Program (SNAP) authorization card ("Bridge Card"), and by such conduct obtained

approximately $420.00 in goods in a manner contrary to the statutes and regulations governing

the SNAP Program.


7 U.S.C. § 2024(b)(1)
18 U.S.C. § 2

## COUNT 17
### (False Statement to Agent of the United States)

57.     On or about August 25, 2011, in Ingham County, in the Southern Division of the

Western District of Michigan, Southern Division, the defendant,

MOHAMAD ABDULJABER,

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and

representation in a matter within the jurisdiction of a department or agency of the United States,

to wit:  during an interview with law enforcement officials, including a Special Agent of the

United States Department of Agriculture Office of Inspector General for Investigations,

regarding an investigation into allegations of Supplemental Nutritional Assistance Program

(SNAP) authorization card fraud, commonly referred to as "Bridge Card" or "50/50" fraud,

MOHAMAD ABDULJABER stated that no one ever approached him about doing Bridge Card

or 50/50 fraud, that he never dealt with Bridge Card or 50/50 fraud, and that he does not do

Bridge Card or 50/50 fraud, when, as MOHAMAD ABDULJABER there and then knew, in

truth and fact, MOHAMAD ABDULJABER had been approached to participate in a Bridge

Card and 50/50 fraud on or about May 20, 2011, and MOHAMAD ABDULJABER participated

in a Bridge Card and 50/50 fraud on that same date by paying approximately $210.00 cash to

utilize another person's Bridge Card to purchase approximately $420.00 in groceries.


18 U.S.C. § 1001(a)(2)

**FORFEITURE ALLEGATION**
**(Conspiracy to Commit Health Care Fraud)**

The allegations contained in Count 1 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(7).

Upon conviction of the offense in violation of 18 U.S.C. §§ 1347 and 1349 set forth in Count 1 of this Indictment, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.  The property to be forfeited includes, but is not limited to, the following:

1.     MONEY JUDGMENT: Pursuant to 18 U.S.C. § 982(a)(7), a sum of money equal to at least $704,000.00, which represents gross proceed traceable to the offense charged in Count 1.

2.     SUBSTITUTE ASSETS:  If any of the property described above, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred, or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to

21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).  Such

substitute property shall include, but not be limited to, the real property listed on Exhibit A

included in this Indictment.

18 U.S.C. § 982(a)(7)
21 U.S.C. § 853(p)
18 U.S.C. §982(b)(1)
28 U.S.C. § 2461(c)

## FORFEITURE ALLEGATION

### (Conspiracy to Pay and Receive Health Care Kickbacks)

The allegations contained in Count 2 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(7).

Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of a conspiracy to violate 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following:

1.      MONEY JUDGMENT: Pursuant to 18 U.S.C. § 982(a)(7), a sum of money equal to at least $704,000.00, which represents gross proceeds traceable to the offense charged in Count 2.

2.      SUBSTITUTE ASSETS:  If any of the property described above, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred, or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to

21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).  Such

substitute property shall include, but not be limited to, the real property listed on Exhibit A

included in this Indictment.

18 U.S.C. § 982(a)(7)
21 U.S.C. § 853(p)
18 U.S.C. §982(b)(1)
28 U.S.C. § 2461(c)

## FORFEITURE ALLEGATION
### (Conspiracy to Distribute Controlled Substances
### Outside the Usual Course of Professional Practice)

The allegations contained in Count 3 of this Indictment are hereby re-alleged and

incorporated by reference for the purpose of alleging forfeitures pursuant to 21 U.S.C. § 853.

Pursuant to 21 U.S.C. § 853, upon conviction of an offense in violation of 21 U.S.C. §

846, the defendants,

SHANNON WIGGINS, D.O., and
MOHAMAD ABDULJABER,

shall forfeit to the United States of America any property constituting, or derived from, any

proceeds obtained, directly or indirectly, as the result of such offense and any property used, or

intended to be used, in any manner or part, to commit, or to facilitate the commission of, the

offenses. The property to be forfeited includes, but is not limited to, the following:

1.      REAL PROPERTY:

      a.      4415 N. Grand River Avenue, Lansing, Michigan, more fully described as:

            Lots 88 and 89, Northwestern Subdivision No. 3, located on part West ½ of the Northeast ¼ of Section 6, Town 4 North, Range 2 West, City of Lansing, Ingham County, Michigan as recorded in Liber 20 of Plats, Page 5 Ingham County Records.

            Parcel No. 33-01-01-06-252-001

            Titled in the name of Mohamad H. Abduljaber.

      b.      2306 & 2310 East Michigan Avenue, Lansing, Michigan, more fully described as:

            LOTS 479 AND 480, LESLIE PARK SUBDIVISION, CITY OF LANSING, INGHAM COUNTY, MICHIGAN, ACCORDING TO THE PLAT THEREOF RECORDED IN LIBER 4 OF PLATS, PAGE 2, INGHAM COUNTY RECORDS.

23

Parcel No. 33-01-14-305-421-7 & 33-01-14-305-431-6

Titled in the name of: Mohamad Abdul Jaber.

2.      SUBSTITUTE ASSETS:  If any of the property described above, as a result of any act or omission of the defendants:

       a.      cannot be located upon the exercise of due diligence;

       b.      has been transferred, or sold to, or deposited with, a third party;

       c.      has been placed beyond the jurisdiction of the court;

       d.      has been substantially diminished in value; or

       e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).  Such substitute property shall include, but not be limited to, the real property listed on Exhibit A included in this Indictment not otherwise listed above.

21 U.S.C. § 853(a), (p)

**FORFEITURE ALLEGATION**
**(Distribution of Oxycodone and Methadone Outside**
**the Usual Course of Professional Practice)**

The allegations contained in Counts 4 through 12 of this Indictment are hereby re-alleged

and incorporated by reference for the purpose of alleging forfeitures pursuant to 21 U.S.C. § 853.

Pursuant to 21 U.S.C. § 853, upon conviction of an offense in violation of 21 U.S.C. §

841(a)(1), the defendant,

SHANNON WIGGINS, D.O.,

shall forfeit to the United States of America any property constituting, or derived from, any

proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or

intended to be used, in any manner or part, to commit, or to facilitate the commission of, the

offenses.  The property to be forfeited includes, but is not limited to, the following:

1.  REAL PROPERTY:

    a.  4415 N. Grand River Avenue, Lansing, Michigan, more fully described as:

        Lots 88 and 89, Northwestern Subdivision No. 3, located
        on part West ½ of the Northeast ¼ of Section 6, Town 4
        North, Range 2 West, City of Lansing, Ingham County,
        Michigan as recorded in Liber 20 of Plats, Page 5 Ingham
        County Records.

        Parcel No. 33-01-01-06-252-001

        Titled in the name of Mohamad H. Abduljaber.

    b.  2306 & 2310 East Michigan Avenue, Lansing, Michigan, more fully

described as:

        LOTS 479 AND 480, LESLIE PARK SUBDIVISION,
        CITY OF LANSING, INGHAM COUNTY, MICHIGAN,
        ACCORDING TO THE PLAT THEREOF RECORDED
        IN LIBER 4 OF PLATS, PAGE 2, INGHAM COUNTY
        RECORDS.

Parcel No. 33-01-14-305-421-7 & 33-01-14-305-431-6

Titled in the name of: Mohamad Abdul Jaber.

2.      SUBSTITUTE ASSETS:  If any of the property described above, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred, or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).  Such substitute property shall include, but not be limited to, the real property listed on Exhibit A included in this Indictment not otherwise listed above.

21 U.S.C. § 853(a), (p)

A TRUE BILL

_____
GRAND JURY FOREPERSON

PATRICK A. MILES, JR.
United States Attorney

_____
RAYMOND E. BECKERING III
Assistant United States Attorney

26

**EXHIBIT A**

1. 4415 N. Grand River Avenue, Lansing, Michigan, more fully described as:

   Lots 88 and 89, Northwestern Subdivision No. 3, located on part West ½ of the Northeast ¼ of Section 6, Town 4 North, Range 2 West, City of Lansing, Ingham County, Michigan as recorded in Liber 20 of Plats, Page 5 Ingham County Records.

   Parcel No. 33-01-01-06-252-001

   Titled in the name of Mohamad H. Abduljaber.

2. 2306 & 2310 East Michigan Avenue, Lansing, Michigan, more fully described as:

   LOTS 479 AND 480, LESLIE PARK SUBDIVISION, CITY OF LANSING, INGHAM COUNTY, MICHIGAN, ACCORDING TO THE PLAT THEREOF RECORDED IN LIBER 4 OF PLATS, PAGE 2, INGHAM COUNTY RECORDS.

   Parcel No. 33-01-14-305-421-7 & 33-01-14-305-431-6

   Titled in the name of: Mohamad Abdul Jaber.

3. 5133 Balzer Street, Lansing, Michigan, more fully described as:

   Lot 20, Supervisor's Plat of Balzer's Subdivision, according to the Plat thereof as recorded in Liber 18 of Plats, Page(s) 17, Ingham County Records.

   Parcel No. 33-01-05-05-202-021

   Titled in the name of: Shannon G. Wiggins and Mohamad H. Abduljaber.

4. 300 West Jolly Road, Okemos, Michigan, more fully described as:

   COM THE S 1/4 COR.  SEC 36-N 89 DEG 06' 37" E, ON S SEC. LN. 730 FT TO THE P.O.B -  NO DEG 33' 37" W, 1334.  65 FT, N 89 DEG 29' 31" E, ON S. LN. OF WIND – N – WOOD SUB. 592.96 FT. – SO DEG 26'45" E, ALONG THE E – LN. OF ½ OF 5E ¼ OF SEC., 1330.72 FT. – S89 DEG 06' 32" W OF S SEC. LN. 590.31 FT. TO THE P.O.B SEC. 36 T4N, R1W AC M/L.

Parcel No. 33-02-02-36-451-010

Titled in the name of: Shannon Wiggins

5. 1112 Hammond Street, Lansing, Michigan, more fully described as:

Lot 16, except the West 22 feet thereof, Block 4, Cadwell's Addition, City of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 1 of Plats, Page 52, Ingham County Records.

Parcel: 33-01-01-20-409-101

Titled in the name of: Shannon Wiggins